UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LAVERNE (VERN) TUBERGEN, MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:04-cv-1765-JDT-WTL |
| vs. | ) | |
| | ) | |
| ST. VINCENT HOSPITAL AND HEALTH | ) | |
| CARE CENTER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**[1]

Plaintiff, Dr. Laverne Tubergen ("Dr. Tubergen"), claims that Defendant, St.

Vincent Hospital and Health Care Center, Inc. ("St. Vincent"), wrongfully terminated his

employment in violation of the Age Discrimination and Employment Act ("ADEA").

Following discovery, the undisputed facts show that he has no viable claim for relief and

St. Vincent is entitled to summary judgment.

**I.    Summary Judgment Standard**

The purpose of summary judgment is to "pierce the pleadings and to assess the

proof in order to see whether there is a genuine need for trial." *Matsushita Electric*

*Industrial Co. v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986).  Summary judgment

should be granted only where the pleadings, depositions, answers to interrogatories,

---

[1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Only genuine disputes over material facts can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might impact the outcome of the suit under the governing law.  *Id.*

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *Conley v. Village of Bedford Park*, 215 F.3d 703, 708 (7th Cir. 2000).  Because "summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe."  *Waldridge v. American Hoenchst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  The court's only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Id.*

## II.    *Factual Background*[2]

Dr. Tubergen is a 64 year old licensed ear, nose, and throat doctor who also has a masters degree from the Indiana University Kelly School of Business.  Dr. Tubergen's work experience includes time spent as an Army flight surgeon, a tenured professor at Indiana University School of Medicine, conducting a private practice specializing in otology/neurotology and operation of a private business enterprise.  His most recent experience has been as a hospital administrator for St. Vincent.

St. Vincent, a non-profit charitable corporation providing healthcare services to the public, first employed Dr. Tubergen in 1997 as a part-time medical director for its surgical service line under its organizational structure at the time.  Later in his career, he also assumed and held the musculoskeletal service line medical director duties, when a colleague became ill.  Prior to that time, Dr. Tubergen held privileges as a physician at the hospital and served as an elected Department Chair.  In 1997, St. Vincent instituted an organizational structure which was comprised of nine service lines.  Generally, each

---

[2]    The local rules require that the party responding to a summary judgment motion include a section in his brief "labeled 'Statement of Material Facts in Dispute' which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment."  S.D. Ind. Local Rule 56.1(b).  Plaintiff has not done that.  While he has included in his brief a "Synopsis" and "Statement of the Case" with the intention of setting out the facts in a light most favorable to him, this is not what was intended by the local rule.  The rule is intended to focus the attention of both the parties and the court on which facts are truly being disputed; hence, the rule dictates that "the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy" if they are not specifically controverted in the opposing party's "Statement of Material Facts in Dispute."  Nonetheless, the court has referred to Plaintiff's Synopsis in an attempt to determine the true factual disputes and examine the facts in a light most favorable to him.  However, where it was unclear whether Plaintiff intended to contest a specific factual statement set forth by Defendant, that factual statement was assumed accurate.

service line had at least one medical director and an executive director, usually a nurse administrator, who shared administrative and operational duties for the service line.

The medical director position required Dr. Turbergen to take on a multitude of business and administrative duties. The business duties included: strategic planning, operational and capital budget composition, operational oversight of all subordinate departments, clinical management, staffing and scheduling of employees, employee education and discipline, quality control, marketing, managing physician-nurse and physician-patient relationships, and case management. The administrative duties included: physician management, peer review, credentialing, and re-credentialing. Additionally, as a medical director, Dr. Tubergen had the authority to hire personnel required to carry out the duties within his service lines. He reported directly to St. Vincent Vice President of Delivery Systems, Lynne O'Day.

Dr. Tubergen and St. Vincent entered into employment contracts every two years. His last contract with St. Vincent began on July 1, 2002 and was for part time work at a 60 percent full time equivalent. Pursuant to the contract, Dr. Tubergen was to be paid for his services (set forth above) until the contract terminated on June 30, 2004. However, ninety (90) days after written notice was given, either party could prematurely terminate the agreement.

In 2002, St. Vincent decided it was time to consider a corporate reorganization. Thus, it hired James Houser, an executive who had experience with other hospitals which had engaged in restructuring and reductions in force (RIF) to serve as its Chief

Operating Officer.  Mr. Houser, with the assistance of at least two consultants, was charged with reviewing and restructuring St. Vincent's organizational structure to ensure efficiency.  He was given the authority to determine which positions were kept and which were eliminated.

Dr. Michael Wiemann was the medical director for the oncology service line and Jean Meyer was its executive director.  Recognizing that Houser had been hired for a particular purpose and concerned that any reorganization might cost them their jobs, Dr. Wiemann and Ms. Meyer told Houser of their concern and offered to assist in any way with the evaluation and restructuring to help show him that they should be considered for a permanent spot in any new organizational structure.  Houser accepted their offer and made them part of his steering team.  While Dr. Turbergen testified that it was obvious that Houser was brought in as the "hatchet-man," he did not share the same enthusiasm for a restructuring and believed his job was safe.  He did submit his name for consideration for the position of hospital president in 2003;[3] nevertheless, he did not volunteer to assist Houser and the consultants with the evaluation process and disagreed with the idea that there was a need for a new organizational model.  However, he did participate by responding to the organizational structure questions posed to the various directors by Mr. Houser' team and the consulting firm.

At the conclusion of the evaluation, in late 2002, Mr. Houser's steering team and the consulting firm found St. Vincent's productivity suffering due to inefficiency.  Early

---

[3]  Though considered for the position, he was not appointed as the hospital president. That position was filled by Dr. Patricia Maryland and Dr. Tubergen has not claimed discrimination with regard to her receipt of that position.

on, Mr. Houser and those working on the project recognized that junior and senior staff would have to be let go as part of the cure.  Further, Mr. Houser, the consulting firm, and St. Vincent Board Members were not proponents of the current service line structure and deemed it cumbersome and top-heavy.  Accordingly, to remain competitive with other health care providers, Mr. Houser, the consulting firm, and St. Vincent's board decided that a substantial reorganization needed to be undertaken in order to remedy the inefficiency.

Mr. Houser and the consulting firm wanted to maintain that part of the management structure which called for shared physician-nurse administrative heads so as to ensure good physician-nurse relations.  However, they wanted to eliminate the medical service lines and place the services back under the relevant department heads. They determined that a corporate reorganization would streamline, standardize, and separate the business and clinical service aspects, leaving the business aspects to the specialized business personnel and the healthcare aspects to the health professionals. Pursuant to these goals, St. Vincent implemented a RIF, resulting in the elimination of numerous positions, including all the medical and executive director positions.  Over 300 other St. Vincent employees lost their jobs as well in 2003.

Dr. Tubergen was one of the many employees who was notified that his position was being eliminated as a result of the RIF.  On June 20, 2003, Mr. Houser terminated Dr. Tubergen's employment, as well as three service line executive heads [Mary Ann Scott (age 56), Cindy Leigh (age 56), and Linda Hermann (age 54)].  Dr. Tubergen was told that his termination had nothing to do with his performance, his job was simply

-6-

being eliminated as part of the RIF.  A few days prior, Mr. Houser also informed Lynne

O'Day (age 60), who was the direct supervisor of those four directors, that her job was

being eliminated as well.  Pursuant to Dr. Tubergen's employment contract, St. Vincent

notified Dr. Tubergen, orally and in writing, that he would be terminated as part of the

RIF.  Additionally, St. Vincent continued to pay Dr. Tubergen for 90 days after he was

notified of his termination.  The termination notice he was given invited him to apply for

any newly created positions for which he felt he was qualified and Mr. Houser advised

him of that opportunity as well.

Mr. Houser's steering team and the consultants discussed which medical and

executive directors would best fit newly created positions, most of which were not

completely designed or filled until later in 2003 or 2004.  As best as can be determined

from the record, the names, ages, and service line responsibilities of directors at the

start of the restructuring are set forth below.

| St. Vincent Employees | Age on June 20, 2003 | Service Line Position(s) Held Prior to the Reduction in Force |
|---|---|---|
| *Medical Directors* | | |
| Dr. Phillip Eskew | 61 | Medical Director of Women & Infants |
| Dr. Vern Tubergen | 61 | Medical Director of Surgical Specialties and Musculoskeletal |
| Dr. Andrew Morrison | 58 | Medical Director of Stress Centers |
| Dr. Harry Laws | 55 | Medical Director of Children's Hospital |
| Dr. Michael Wiemann | 54 | Medical Director of Oncology |
| Dr. Charles Orr | 53 | Medical Director of Cardiology |

| | | |
|---|---|---|
| Dr. Robert Robison | 49 | Medical Director of Cardiology |
| Dr. Wes Wong | 49 | Medical Director of Medical Specialities and Neuroscience |
| Dr. John Bates | 43 | Medical Director of Cardiology |
| Dr. Charles James | Unspecified[4] | Medical Director of Primary Care |
| ***Executive Directors*** | | |
| Ms. Ramona Paulsrud | 62 | Executive Director of Women & Infants |
| Ms. Mary Anne Scott | 56 | Executive Director of Children's Hospital |
| Ms. Cindy Leigh | 56 | Executive Director of Surgical Specialties and Musculoskeletal |
| Mr. Paul Lefkovitz, PhD | 55 | Executive Director of Stress Centers |
| Ms. Linda Hermann | 54 | Executive Director of Medical Specialities and Neuroscience |
| Ms. Jean Meyer | 44 | Executive Director of Oncology |
| Ms. Ann Coleman | 40 | Executive Director of Cardiology |

By the end of the RIF, which took several months to complete, all medical director positions, as they had theretofore existed, were eliminated from the clinical management structure.   However, after being informed of the elimination of their positions, several former medical and executive directors sought and/or received newly created positions within the reorganized management structure.  Some new positions were created prior to Plaintiff's departure, and some were created after he left.  The table below sets forth positions held after the RIF by the former medical and executive directors.

---

[4]  There appears to be no evidence in the record disclosing Dr. James's age.

| St. Vincent Employees | Age on June 20, 2003 | Position(s) Held After the Reduction in Force |
|---|---|---|
| ***Former Medical Directors*** | | |
| Dr. Phillip Eskew | 61 | Director of Physician/Patient Relations |
| Dr. Vern Tubergen | 61 | Not Employed by St. Vincent |
| Dr. Andrew Morrison | 58 | Not Employed by St. Vincent |
| Dr. Harry Laws | 55 | Not Employed by St. Vincent |
| Dr. Michael Wiemann | 54 | Senior Vice President and Chief Medical Officer of Clinical Excellence |
| Dr. Charles Orr | 53 | Co-Medical Director of Cardiovascular Services |
| Dr. Robert Robison | 49 | Co-Medical Director of Cardiovascular Services |
| Dr. Wes Wong | 49 | Not Employed by St. Vincent |
| Dr. John Bates | 43 | Not Employed by St. Vincent |
| Dr. Charles James | Unspecified | Not Employed by St. Vincent |
| ***Former Executive Directors*** | | |
| Ms. Ramona Paulsrud | 62 | Executive Director of Women & Infants |
| Ms. Mary Anne Scott | 56 | Not Employed by St. Vincent |
| Ms. Cindy Leigh | 56 | Not Employed by St. Vincent |
| Mr. Paul Lefkovitz, PhD | 55 | Not Employed by St. Vincent |
| Ms. Linda Hermann | 54 | Not Employed by St. Vincent |
| Ms. Jean Meyer | 44 | Senior Vice President and Chief Nursing Officer of Clinical Excellence |
| Ms. Ann Coleman | 40 | Executive Director of Cardiology |

Mr. Houser offered Dr. Wiemann and Jean Meyer new administrative positions during the course of their assistance on the steering team and prior to Plaintiff being let go. While Dr. Tubergen was encouraged to apply for any of the newly created positions at the time of his termination, he did not. Other former medical directors and executive directors did apply for the new positions and, as can be seen in the chart above, some received assignments. Though he had applied for the hospital presidency during the first quarter of 2003, and also states that he told Lynne O'Day that he would be willing to pick up some of the work of the medical director for anesthesiology when that director resigned during the spring, he says that he did not formally apply for the other positions because he did not believe St. Vincent would rehire him.

After his termination, St. Vincent offered Dr. Turbergen a severance package. There were no previously negotiated severance terms, so the package was offered contingent upon Dr. Tubergen's execution of an agreement which limited his ability to collect anything other than that which was offered in the package. However, Dr. Tubergen refused to sign the agreement because he felt the severance package offered him nothing he was not already entitled to.

Sometime after his departure from St. Vincent, Dr. Tubergen heard from Dr. Laws of a statement which Mr. Houser had made in a meeting approximately a week prior to Plaintiff's June 20, 2003 terminations. Dr. Laws had a meeting with Mr. Houser pertaining to staffing at the children's hospital. During the meeting, Mr. Houser indicated that the children's hospital's executive director, Mary Ann Scott, would be terminated as part of the RIF. Dr. Laws recalled that while relating this development,

Mr. Houser stated "it was the beginning of getting rid of the old guard."[5]  Dr. Tubergen was not mentioned during that meeting, and Dr. Laws indicated he believed the "old guard" statement pertained to Mary Ann Scott and/or the children's hospital and was in reference to her longevity in a managerial role.

On December 5, 2003, Dr. Tubergen filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming St. Vincent had wrongfully terminated his employment based upon his age.  He also claimed that the severance package offered to him was withdrawn after he complained of age discrimination.  On August 2, 2004, Plaintiff received his "right to sue letter" from the EEOC and later filed the complaint in this action.  In his complaint here, he alleges that he was terminated from employment with St. Vincent because of his age, in violation of the ADEA.  He has not asserted retaliation in connection with the severance package in this lawsuit.

## III.    Discussion

The ADEA protects those over the age of forty from discrimination in the workplace.  To establish a prima facie case of employment discrimination based on age, a plaintiff may prove his case through two methods: 1) the direct method; or 2) the indirect method.  *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004).  Like the plaintiff in *Steinhauer*, Dr. Turbergen contends that he can prove his case by both the direct proof method, through direct and circumstantial evidence, and the indirect proof

---

[5]  Mr. Houser does not deny that he made the statement, but says he has no recollection of making it.  If he made such a statement, Houser says it would have been in reference to the need for a change in leadership.

method.  Although untimely, insofar as he raised no such claim in his EEOC charge, Dr. Tubergen also alleges that St. Vincent failed to rehire or consider rehiring him for any of the new administrative positions created as a part of the restructuring.  However, as will be discussed and as Dr. Tubergen readily acknowledges in his deposition, he chose not to apply for the newly created positions with St. Vincent and failed to timely amend or supplement his EEOC charge with respect to any claim of failure to rehire.

### A.    Direct Method of Proof

The direct method of proof consists of proving retaliation through either "direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose . . . ."  *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003).

### 1.    Direct Evidence

Historically, direct evidence has been distinguished as "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption."  *Cowan v. Glenbrook Sec. Servs.*, 123 F.3d 438, 443 (7th Cir. 1997) (citing *Plair v. E.J. Brach & Sons*, 105 F.3d 343, 347 (7th Cir. 1997)).  In discrimination cases, it has been said that "[T]his evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question."  *Cowan*, 123 F.3d at 443; *see also Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 714 (7th Cir. 1999).  In essence it is an acknowledgment of discriminatory intent.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).

In *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900 (7th Cir. 2006),
Judge Posner seems to reaffirm the notion that direct evidence in a discrimination case
is that which is tantamount to an admission of discriminatory intent, but disagrees with
the traditional distinction made between circumstantial and direct evidence.  According
to Judge Posner, all evidence, even eye witness testimony, requires some degree of
inference.  *Id.* at 903.  Consequently, nothing is gained by saying that direct evidence is
that which demonstrates a conclusion without the need for inference.  *Id.*  In reversing a
summary judgment, in part, Judge Posner wrote for the court that while there was no
direct evidence of discrimination, "which would, as normally understood in a retaliation
case, consist of an admission by West or other company officers that the motive for
firing Sylvester was to retaliate. . . ," there was circumstantial evidence sufficient to
allow a jury to conclude that the plaintiff's accusations of discrimination were a cause of
her being fired.

Dr. Tubergen's case also lacks any direct evidence that he was terminated as a
result of his age.  Although Dr. Tubergen avers that Mr. Houser's "old guard" statement
to Dr. Laws is direct evidence that he was terminated because of his age, Dr. Laws
testified that he assumed the statement was made with regard to the termination of
Mary Ann Scott because it was made during a conversation about the children's
hospital staffing.  Dr. Tubergen's name was not explicitly or impliedly referenced in the
conversation and because the "old guard" statement was not used in a context which
included or pertained to Dr. Tubergen, there is no way that it can be treated as being
tantamount to an admission of discriminatory intent.

-13-

### 2.    *Circumstantial Evidence*

Circumstantial evidence is evidence that provides "a basis for drawing an inference of intentional discrimination."  *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).  The Seventh Circuit has recognized three types of circumstantial evidence which might serve to directly prove employment discrimination, and those are:

> 1) suspicious timing, ambiguous statements oral or written, behavior towards or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn;
>
> 2) evidence, whether or not rigorously statistical, that younger employees similarly situated to the plaintiff received systematically better treatment; and,
>
> 3) evidence that the plaintiff was qualified for a remaining position but passed over in favor of a younger person and that the employer's stated reason for its decision is "unworthy of belief, a mere pretext for discrimination."[6]

*Id.*

Circumstantial evidence sufficient to prove intentional discrimination may include evidence from any or all three of the categories.  The various bits and pieces of evidence may on their own be insufficient to infer discrimination, but in the aggregate they could, and must, be great enough to compose what some courts have described

---

[6]  Evidence falling into the second or third category of circumstantial evidence would also be evidence tending to support the fourth element of a prima facie claim of discrimination under the indirect method of proof.  Likewise, circumstantial evidence of the third type might also be evidence tending to support a finding of pretext under the burden shifting template of the indirect method of proof, all of which will be discussed later in this entry.  The similarity between circumstantial evidence tending to support a direct inference of discrimination and the evidence necessary to sustain a claim under the *McDonnell Douglas* indirect proof method was discussed in two recent Seventh Circuit decisions.  *Luks v. Baxter Healthcare*, No. 05-3866, __ F.3d __, 2006 WL 3113591 (7th Cir. Nov. 3, 2006); *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900 (7th Cir. 2006).

as a convincing mosaic of discrimination against the plaintiff, *Adams*, 324 F.3d at 939 (citing *Troupe*, 20 F.3d at 737), or what more recently has been described as simply the amount of evidence necessary to allow a reasonable jury to conclude that discrimination was a motivating factor in the adverse employment decision. *Sylvester,* 453 F.3d at 903-04.

Mr. Houser's remark to Dr. Laws is a piece of circumstantial evidence falling under the first category, because it holds the potential of being interpreted as a discriminatory comment made with regard to the termination of another employee of similar age, who was also let go during the course of the RIF.  Dr. Turbergen sees that statement as a link to his termination and the termination of other older administrators at his level, because many were let go shortly after the statement was made.  While his chronology is accurate, what weakens any potential inference of discrimination is the fact that the entire service line structure was revamped and all medical director positions under that structure were eliminated, regardless of the age of the individual who held the position.  Additionally, in all, over 300 employees of all ages lost their jobs as a part of the RIF, making it even more unlikely that the comment was a reflection of age based animus or that the RIF was a ruse to allow the defendant to rid itself of older employees.

The Seventh Circuit has told us that the use of the term "good old boys" is so broad in its application so as to offer little to no circumstantial value.  *Lindsey v. Baxter Healthcare Corp.*, 962 F.2d 589, 588 (7th Cir. 1992).  More recently, management's acknowledgment that a supervisor referred to some employees as "old timers" and

admitted he preferred "high energy" people, coupled with testimony that he had called one employee "the old guy in the department" and also said he wanted to get rid of the "good old boys" and put an end to "the good old boy's club" were insufficient, even in the aggregate, for the appellate court to find circumstantial support for a claim of age discrimination by a plaintiff who worked under that supervisor and was terminated for poor performance.  *Luks v. Baxter Healthcare Corp.*, No. 05-3866, __ F.3d __, 2006 WL 3113591, at *5-6 (7th Cir. Nov. 3, 2006).  In the matter at hand, this court sees no basis for allowing a comment about getting rid of "the old guard," made without any connection to Dr. Tubergen or the decision to eliminate his position, to form a basis for a discriminatory inference with respect to his termination as part of the RIF.

Under the second category of circumstantial evidence, Tubergen is again stymied in his effort to show discrimination by the fact that the entire management level he served on was eliminated and, regardless of age, all medical and executive directors were outside looking in at a new structure.  However, Dr. Tubergen asserts that younger administrators, whose positions were being eliminated, received automatic consideration for employment under the new management scheme.  Unfortunately for Dr. Tubergen, his assertions are not supported by corroborating evidence.  In fact, there is direct testimony to the contrary.  Jean Meyer and Steve Thomas, both a part of the reorganization steering committee, testify that they, Mr. Houser, and the consultants did consider Dr. Tubergen for newly created positions.[7]  However, they maintain that Dr.

---

[7] Although the questioning in that part of his deposition remains a bit confusing, it appears from his answers that Mr. Houser personally considered Plaintiff for only one new position--president of the hospital, a position for which Dr. Tubergen had expressed an interest. Houser's deposition testimony suggests that many of the other positions for which Plaintiff

(continued...)

Tubergen was not the best candidate to fill the positions and showed little interest in the

new structure.  There is no evidence that they did not actually believe he was less

suited for the positions.  Dr. Tubergen's failure to apply for any position post-

termination, despite the invitation to do so, reinforces the notion that he was not

particularly interested in the new administrative structure.  In short, nothing here

supports a pattern or systematic attempt to bestow preferential treatment upon younger

members of the medical administration.

Dr. Tubergen argues that he has circumstantial evidence of the second or third

variety because other former medical and executive directors obtained employment in

newly created positions, while he did not.  First, any comparison of Dr. Tubergen, as a

medical director, to someone holding an executive director position is of no value.

Executive director positions were filled by nurses and, in one instance, a psychologist.

A different educational and skill background was required for those positions because a

different type of expertise was utilized.  Though they were partners in the administration

of various substantive areas, they had clearly defined differences in most important

areas.  In order for an individual to be considered similarly situated to a plaintiff, the

plaintiff must show that they are directly comparable in all material respects.  *Burks v.*

*Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).  That generally involves a

consideration of factors such as whether they report to the same person, are subject to

---

[7](...continued)
contends he should have been considered were positions evaluated and filled through the
recommendations of others on the steering team such as Meyer, Thomas, and the consultants.
This was done after Dr. Tubergen's departure and after he was asked, but declined, to apply for
post-RIF employment. In any event, Houser's testimony does not contradict the testimony of
Meyer or Thomas, who both state that they considered Dr. Turbergen for new positions which
were in the process of being designed prior to his departure.

the same standards, have comparable education, expertise and qualifications.  *Id.*
Here, the nurses and doctors had distinct administrative roles.  Therefore, the only
proper comparison is between those who served as medical directors.  Even then, the
difference in substantive specialties exposes some relevant differences.

Those who were serving in the role of medical director prior to the RIF include:
Dr. Wes Wong (age 49), Dr. Robert Robison (age 49), Dr. Charles Orr (age 53), Dr.
Harry Laws (age 55), Dr. John Bates (age 43), Dr. Phillip Eskew (age 61), Dr. Michael
Wiemann (age 54), Dr. Andrew Morrison (age 58), and Dr. Charles James (age
unspecified).

Dr. Wong served as the medical director of the Medical Specialities and
Neuroscience service lines.  Similarly, he and Dr. Tubergen had simultaneously headed
two different service lines and both failed to be awarded any of the newly created
positions.  Although Dr. Wong was substantially younger than Dr. Tubergen, Dr. Wong's
position was eliminated during the course of the RIF and he was not invited to fill any
new positions.  Thus, Dr. Wong, a younger comparator, did not receive preferential
treatment and, in fact lost his job as well.

Dr. Robison and Dr. Orr, both former medical directors of the Cardiology service
line, were retained as independent contractors to serve as Co-Medical Directors of
Cardiovascular Services.  Although Dr. Robison is substantially younger and Dr. Orr is
eight (8) years younger than Dr. Tubergen, Dr. Tubergen does not claim that he was a
better candidate for the Cardiovascular Services Medical Director positions.  This is

likely because Dr. Tubergen has little to no expertise in the practice of cardiac medicine and would not be qualified to head up its administration at St. Vincent.

Plaintiff elects not to compare himself to Dr. Laws either.  At 55, Dr. Laws is not substantially younger than Dr. Tubergen.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659 (7th Cir. 2001).  Further, Dr. Laws testifies that he was let go by St. Vincent for reasons other than the RIF.  In any event, his departure neither benefits Plaintiff from the standpoint of a comparator, nor does it serve as evidence of that St. Vincent used the RIF to target older employees, as argued by Dr. Turbergen.

Dr. Bates, another former medical director of the Cardiology service line, did not continue employment with St. Vincent after he was let go during the course of the reorganization.  So, though he may have been younger than Dr. Tubergen, he was not put in the new administration and, as a comparator, holds no circumstantial evidentiary value.

Dr. Phillip Eskew previously served as the Women and Infants Medical Director. Like all the medical directors, his specific job was eliminated.  He was invited to serve as St. Vincent's Director of Physician-Patient Relations under the new administrative scheme, after his position was eliminated.  However, the appointment of Dr. Eskew to the new position holds no evidentiary value to Dr. Tubergen because the two physicians were both 61 years old at the time of the RIF.  Again, this appointment not only fails to serve as evidentiary support for the Plaintiff, but shows a lack of concern with regard to the age of those serving in the new administrative organization.

Dr. Wiemann is seven years younger than Dr. Tubergen.  Since Dr. Wiemann's age placed him within the group of individuals protected by the ADEA as well and because he is less than ten years younger than Dr. Turbergen, the courts do not view him as having a substantial age difference.  *Bennington*, 275 F.3d at 659; *see also Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 892 (7th Cir. 2001).  But there are additional reasons to discount the evidentiary value of Dr. Wiemann's appointment to a post-RIF position.

Dr. Wiemann testified that, when Mr. Houser was hired, it was apparent that St. Vincent would undergo corporate restructuring.  Dr. Wiemann took the initiative to go to Houser to offer to help in any way possible, in hopes of preserving his employment with any new management structure.  As a result of Dr. Wiemann's pro-active approach, he was appointed to the committee which evaluated the current structure and personnel and later was asked by Houser to serve as the Senior Vice President/Chief Medical Officer of Clinical Excellence in the new administration.  Dr. Tubergen, on the other hand, indicated he felt that his job was secure, regardless of any restructuring that might occur.  Dr. Tubergen failed to see any problem with the existing management structure and disagreed with notion that there was inefficiency or a need for a change.  Dr. Wiemann's pursuit of a position in the new structure and the fact that he shared upper management's opinion of the need for a new structure were logically integral to his retention and in many respects made him a better candidate for promotion to a senior management position within the new administration.  Dr. Tubergen's failure to

-20-

apply for any positions after his termination, further demonstrated his languid attitude toward the new management scheme.

Dr. Andrew Morrison previously served as the Stress Center's medical director. Dr. Morrison was only three years younger than Dr. Tubergen and for that reason any favorable treatment would not necessarily serve to support Dr. Tubergen's age discrimination claim.  Nevertheless, there is no indication in the record that Dr. Morrison was retained to fill any of the newly created positions.

Prior to the RIF, Dr. Charles James served as the Primary Care service line medical director.  However, he was not invited to fill any of the newly created positions. Additionally, there is no evidence in the record indicating Dr. James's age, areas of expertise, or experience.  Thus as a comparator, he offers no evidentiary value.

Comparison to other medical directors has netted nothing to support Plaintiff's claim of disparate treatment.  However, he insists that there are other employees who should also be a part of any comparison.  Dr. Tubergen argues that four other St. Vincent physician employees received better treatment than Dr. Tubergen because they were rehired by St. Vincent in newly created or consolidated positions for which Dr. Tubergen could have been retained.  Those employees are: Gary Fammartino (age 47); Dr. William Spanenburg (age 36); Dr. Daniel LeGrand (age 56); and Dr. Bruce Roughraff (age 42).  Since they were not medical directors, their value as comparators is immediately questionable.  But, even after making comparisons, the court must conclude that Plaintiff is still without sufficient circumstantial evidence to cause a

reasonable fact finder to conclude that their retention in the new management scheme is indicative of a discriminatory motive for making Dr. Tubergen or anyone else subject to the RIF.

Gary Fammartino (age 47) is substantially younger than Dr. Tubergen.  He was a respiratory therapist who was placed in a new vice president position charged with ordering and obtaining medical products.  The position was developed after Plaintiff's departure.  St. Vincent says Fammartino was placed in this position because of his business expertise and because the position required little clinical expertise.  It argues that Dr. Tubergen would not have been considered an appropriate choice for the position, even if he had applied, because the emphasis was on a particular type of business expertise, supply chain activities, as opposed to clinical expertise and the type of broad based general business expertise possessed by Plaintiff.

Nevertheless, Dr. Turbergen claims that Fammartino ended up performing about 20 to 25 per cent of the responsibilities he previously performed and that he was qualified to perform all of the responsibilities given to Fammartino.  However, Plaintiff's own subjective opinion of his qualifications or ability to perform a particular job does not carry the day in a discrimination case.  *See Sembos v. Philips Components*, 376 F.3d 696, 702 (7th Cir. 2004); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1178-81 (7th Cir. 2002). Nor does it constitute circumstantial evidence pointing directly at a discriminatory reason for St. Vincent's actions.

Dr. Tubergen asserts he would have been a better candidate to fill the Case Management medical director position, which was filled in December 2003 by Dr. Spanenburg, who was considerably younger.  However, as St. Vincent points out, the position was not available until well after Dr. Tubergen was terminated and he never sought consideration for further employment once he left.  Besides, even if Plaintiff's own subjective opinion of his qualifications or past performance mattered, which it does not, the question is not whether he would actually have been the better candidate, but whether St. Vincent believed the person appointed was the better qualified.  *Luks*, 2006 WL 3113591, at *7.

Similarly, Dr. LeGrand (age 56) was appointed to the position of Chief of Surgery in February 2004.  Completed development of that position post-dated the initial job cuts in June of 2003 and came after Plaintiff's position had been eliminated and he had left St. Vincent's employ.  Plaintiff never sought to be rehired in any newly developed position, though he admits to receiving notice just a few days after his termination of a number of positions in the new administration which had yet to be filled.  Additionally, the Chief of Surgery position is now a contracted position, meaning Dr. LeGrand is not a St. Vincent employee and receives no benefits other than the contracted price for his services.  Finally, at five years junior, Dr. LeGrand is not substantially younger than the Plaintiff.

While the court can not be certain, due to the incongruous nature of Plaintiff's briefing, Dr. Tubergen appears to argue that Dr. Roughraff (age 42) was not as qualified as he to serve as the post-RIF Orthopedic Department Chair.  The problem with this

argument is that the Department Chair is an elected position which St. Vincent does not control.  While the position comes with a stipend paid by St. Vincent to OrthoIndy, an organization of orthopaedic doctors, the physicians in that department do the actual selection via an election process and the chairperson is not considered an employee of St. Vincent.

There is simply not enough circumstantial evidence of St. Vincent treating younger employees more favorably to add weight or conviction to Plaintiff's interpretation of the "old guard" comment made by Houser as demonstrating discriminatory animus on the part of St. Vincent.  Consequently, Plaintiff's claim fails under the direct proof method.

### B.    Indirect Method of Proof

In order to prove age discrimination under the indirect method of proof, "the plaintiff must first establish a prima facie case by meeting the following elements:  1) he was a member of a protected class; 2) he was meeting his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of his protected class or were substantially younger were treated more favorably.  *Gordon v. United Airlines,* Inc., 246 F.3d 878, 885-86 (7th Cir. 2001).  If the four elements to establish a prima facie case have been established, the burden is transferred to the party moving for summary judgment, St. Vincent in this case, to provide a legitimate non-discriminatory reason for its actions. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).  Assuming St. Vincent

meets this evidentiary requirement, Dr. Tubergen then bears the burden of proving by a preponderance of the evidence that St. Vincent's justification is pretextual. *Id.*

Where there is a reduction in force, the employer is under no obligation to terminate younger employees first, transfer older employees to available positions, or even notify its work force of what positions will remain or exist in the restructured organization. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 615 (7th Cir. 2000).  As the employer, St. Vincent's obligation was to provide its older employees with the same placement opportunities as it provided younger employees who were subject to the RIF. *Id.*; *see also Sembos v. Philips Components*, 376 F.3d 696, 703 n.5 (7th Cir. 2004). And, if the older employees fail to take advantage of those opportunities, they scotch any claim of discrimination.  *Torry v. Northrup Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005).[8]

In this instance, the only element of the prima facie case at issue is the showing that other similarly situated younger employees were treated more favorably.  And, in the case of younger employees who also fall above the age of 40, the age difference must be ten years or greater to be presumptively substantial and fulfill the requirement. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659 (7th Cir. 2001).

---

[8]  A theme runs throughout the Plaintiff's briefs and arguments.  Though not specifically stated, the message is that as a senior medical director, it would have been nice to have received greater notice of the impending administrative change and the possibility that it could effect his job status.  The idea that a senior medical director should receive a personal RIF warning and an invitation from the CEO to seek a position within the restructured organization is just not consistent with the law.  The notion that "I deserved better than this" runs rampant in Plaintiff's briefs, and perhaps he did from a courtesy standpoint.  Nevertheless, the court is here to determine if the employer met its legal obligations, not whether it acted politely.

To summarize what the court discussed in more detail earlier, the appropriate comparators here are the other medical directors.  One of those directors was also 61 years old at the time of the RIF and, unlike Dr. Tubergen, was appointed to a position within the new management scheme, a fact which does not suggest age discrimination at work.  Another, whose age is not in the record, was not retained by St. Vincent under its new administrative structure.  That leaves six other medical directors who were all younger than Plaintiff.  Three of those were not retained.  Of the three younger medical directors who did maintain employment with St. Vincent following the RIF, two were less than ten years younger than Dr. Tubergen.  The other specifically applied for the position, which was not developed and filled until after Plaintiff had been let go.  Though invited by letter to do so, Plaintiff never sought to be considered for any of the positions that were filled post-RIF.

Plaintiff attempts to gloss over the fact that he made no effort to be considered for any of the new positions, but that fact is of paramount import here.  It kills his prima facie case and, without evidence that his failure to apply was caused by a discriminatory practice, it eliminates the need for St. Vincent to offer a legitimate reason for its actions.  *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738-39 (7th Cir. 2006).  Regardess, Dr. Tubergen contends that St. Vincent's discriminatory motive is evident because his duties were divided up among younger individuals who filled spots in the new organizational structure.  However, even if true, that has no impact where the Plaintiff was invited, but did not seek, to be considered for positions within the new administrative structure.  Nor is this a "mini-RIF" case where a single individual was let

go and his duties were absorbed by others.  *See Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1331-32 (7th Cir. 1995).  St. Vincent has never said that it was getting rid of all the job responsibilities inherent in the old medical director position held by Dr. Tubergen, only that it was cutting jobs to increase efficiency.  Therefore the fact that a large percentage of the responsibilities of the position ended up being divided between younger employees who sought a spot in the new organization gets the Plaintiff nowhere.

St. Vincent states that it pursued a RIF and the elimination of the entire "service line" structure of management in order to reduce costs and become more efficient.  This is certainly a non-discriminatory reason for its actions.  And, while the Plaintiff has not successfully demonstrated a prima facie case under the indirect method of proof, even if the court were to give him the benefit of the doubt on the fourth element of his case, he has not brought forth sufficient evidence to create a question of fact regarding the veracity of the articulated nondiscriminatory reason.  Dr. Tubergen argues that the so-called RIF did not end up saving St. Vincent money and simply redistributed responsibilities.  However, it is quite clear from the record, and specifically the number of management and non-management employees who lost their jobs, that there was indeed a substantial restructuring at St. Vincent.  While St. Vincent correctly points out that Plaintiff is playing fast and loose with the financial statistics when arguing the failure of the RIF, it makes no difference because the court is not here to measure the financial success of that effort.  So long as it is satisfied from the evidence of record that the Defendant believed that its restructuring efforts would attain the stated goals and that its

stated reason was not a pretext for discrimination, the financial success of the RIF is irrelevant. *Balderson v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 323 (7th Cir. 2003).

### IV.     Motion to Strike

After St. Vincent sought and obtained approval of this court to file a response to the Plaintiff's sur-reply brief, Plaintiff filed a reply to the response.  The rules do not provide for such a reply and he did not seek the court's permission to do so.  This reply was simply an attempt to reargue points made earlier and to have the last word.  St. Vincent appropriately moved to strike the reply and the court will grant the same.

### V.     Conclusion

Plaintiff is no doubt convinced that the "old guard" comment made by Houser to Dr. Laws while discussing the elimination of positions at the children's hospital should suffice to allow him to pursue his claim of age discrimination with a jury.  But, it is a single piece of circumstantial evidence that lacks any buttressing facts in light of the large number of young and old employees who lost their jobs during the RIF.  Further, whether it was pride, arrogance, neglect, or apathy which caused Dr. Turbergen to refrain from applying for any of the new administrative positions filled after his departure, that failure destroys his ability to claim that others who did so were treated more favorably because of age.  There is simply insufficient evidence for a reasonable jury to conclude that St. Vincent harbored a discriminatory intent with respect to its

termination of Dr. Tubergen.  To that end, no question of material fact remains and St. Vincent is entitled to summary judgment.

Accordingly, St. Vincent's Motion to Strike Plaintiff's Reply (Document #65) and its Motion for Summary Judgment (Document #34) are **GRANTED**.  Final judgment shall be duly entered.

ALL OF WHICH IS ENTERED this 16th day of November 2006.

John Daniel Tinder, Judge
United States District Court

Copies to:

Kevin Joseph Gfell
Hall Render Killian Heath & Lyman PC
kgfell@hallrender.com

Raymond J. Hafsten, Jr.
hafsten@sbcglobal.net

John Patrick Ryan
Hall Render Killian Heath & Lyman PC
jryan@hallrender.com

Magistrate Judge William T. Lawrence